Spencer C. Skeen, CA Bar No. 182216
spencer.skeen@ogletree.com
Tim L. Johnson, CA Bar No. 265794
tim.johnson@ogletree.com
Jesse C. Ferrantella, CA Bar No. 279131
jesse.ferrantella@ogletree.com
Cameron O. Flynn, CA Bar 301830
cameron.flynn@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA  92122
Telephone:     858.652.3100
Facsimile:      858.652.3101

Attorneys for Defendant SERVICE KING PAINT & BODY, LLC
erroneously sued as SERVICE KING, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERICA MONIZ, as an individual and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>     vs.<br><br>SERVICE KING, INC. a California Corporation; SERVICE KING PAINT & BODY, LLC, a Texas Limited Liability Company; and DOES 1 through 100;<br><br>                Defendants. | Case No. 18-CV-07372-EJD<br><br>**OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |

1

**<u>TABLE OF CONTENTS</u>**

2

**Page**

3

I.      Introduction  ....................................................................................... 1

4

II.     Statement Of Facts ............................................................................. 2

5

    A.      Plaintiffs Worked for SK as Service Advisors and Painters ........... 2

6

    B.      SK's Compensation Structure Pays for All Hours Worked ............ 2

7

III.    Legal Standard .................................................................................... 5

8

IV.     Plaintiffs Cannot Certify A Class Based On A False Premise ................. 5

9

    A.      SK Pays Body Technicians and Painters on an Hourly
      Basis ......................................................................................... 5

10

    B.      SK Paid Service Advisors on an Hourly Basis ............................... 8

11

12

V.      Plaintiffs Lack Standing To Pursue Class Claims Based On Conduct That
  They Did Not Experience ..................................................................... 10

13

14

VI.     Plaintiffs Are Inadequate, Atypical Class Representatives ..................... 10

15

VII.    Individualized Issues Regarding Meeting Time Foreclose Certification Of
   "Piece Rate" And "Commission" Classes ............................................. 12

16

17

    A.      The Court Cannot Certify the "Piece-Rate Class" Because
      Liability Cannot Be Determined on a Class-Wide Basis
      and Individual Issues Predominate ............................................. 12

18

19

    B.      The Court Cannot Certify the "Commission Class"
      Because Liability Cannot Be Determined on a Class-Wide
      Basis and Individual Issues Predominate .................................... 17

20

21

    C.      The Court Cannot Certify the "Piece Rate Class" or
      "Commission Class" Because Damages Cannot Feasibly
      Be Determined on a Class Basis ................................................. 19

22

23

VIII.   Individualized Issues Regarding Unpaid Rest Time Foreclose
   Certification Of The "Piece Rate" And "Commission" Classes ............. 20

24

25

IX.     The Unpaid Overtime Classes Should Not Be Certified ........................ 22

26

X.      The Meal Period Class Cannot Be Certified As It Lacks Support And The
  Regular Rate Of Pay Cannot Be Determined ....................................... 22

27

XI.     The Direct Wage Statement Class Should Not Be Certified Because
  Plaintiffs Lack Standing To Pursue The Claim ..................................... 23

28

i

XII.   The Derivative Claims Should Not Be Certified Because The Underlying
       Theories Fail And Should Not Be Certified .......................................................... 24

XIII.  Conclusion   ............................................................................................................ 25

OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

5
*Clemens ex rel. Aggrieved Emps. Pursuant to the Private Attorneys Gen. Act v. Hair Club for Men, LLC,*
No 15-cv-01431 WHA, 2016 WL 1461944 (N.D. Cal., Apr. 14, 2016)...................................25

6

7
*Aldapa v. Fowler Packing Co.,*
323 F.R.D. 316 (E.D. Cal. 2018)...............................................................................................6

8

9
*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,*
247 F.R.D. 156 (C.D. Cal. 2007).............................................................................................12

10
*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) .................................................................................................................10

11

12
*Bluford v. Safeway, Inc.,*
216 Cal. App.4th 864 (2013)..................................................................................................6, 8

13
*Bradescu v. Hillstone Restaurant Group, Inc.,*
14
No. SACV 13-1289-GW, 2014 WL 5312546 (C.D. Cal., Sept. 18, 2014) ..............................23

15
*Brinker Rest. Corp. v. Superior Court,*
53 Cal. 4th 1004 (2012)...........................................................................................................20

16

17
*Brown v. Fed. Expr. Corp.,*
249 F.R.D. 580 (C.D. Cal. 2008).......................................................................................13, 16

18

19
*Brum v. Marketsources, Inc.,*
No. 2:17-cv-00241 JAM EFB, 2017 WL 2633414 (E.D. Cal. Jun. 19, 2017)...........................23

20
*Certified Tire & Serv. Centers Wage & Hour Cases,*
28 Cal.App.5th (2018), *review granted*, Jan. 16, 2019 ............................................................8

21

22
*Comcast Corp. v. Behrend,*
 569 U.S. 27, 34 (2013) ...........................................................................................................20

23
*Cortez v. Best Buy Stores, LP,*
24
No. 11-cv-5053, 2012 WL 255345 (C.D. Cal. Jan. 25, 2012) ..................................................21

25
*Cruz v. MM 879, Inc.,*
329 F.R.D. 639 (N.D. Cal. 2019) ..............................................................................................6

26

27
*Cummings v. Starbucks Corp.,*
No. 12-cv-06345 MWF FFMx, 2014 WL 1379119, at *19 (C.D. Cal. Mar 22, 2014)......................................................................................................................................21

28

*Doyle v. Chrysler Grp., LLC,*
    663 F. App'x 576 (9th Cir. 2016)...............................................................20

*Ferra v. Loews Hollywood Hotel,*
    40 Cal. App. 4th 1239 (2019), *review granted*, 456 P.3d 415 (2020)..........................23

*Frausto v. Bank of Am.,*
    No. 18-cv-01983 MEJ, 2018 WL 3659251 (N.D. Cal. Aug. 2, 2018) .....................23

*Gomez v. J. Jacobo Farm Labor Contr., Inc.,*
    334 F.R.D. 234 (E.D. Cal. 2019).............................................................20, 21

*Gonzalez v. Downtown LA Motors,*
    LP, 215 Cal. App. 4th 36 (2013) ...............................................................6, 8

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) ...................................................................11

*Jones v. Spherion Staffing LLC,*
    No. LA CV-11-06462 JAK, 2012 WL 3264081 (C.D. Cal. Aug. 7, 2012) ................25

*Jovel v. Boiron,*
    No. 11-cv-10803, 2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) ...........................11

*Kandel v. Brother Int'l Corp.,*
    264 F.R.D. 630 (C.D. Cal. 2010)...............................................................10

*Kang v. Wells Fargo Bank, N.A.,*
    No. 17-cv-06220 BLF, 2019 WL 468818 (N.D. Cal. Feb. 6, 2019) .........................9

*Kaplan v. Pomerantz,*
    132 F.R.D. 504 (N.D. Ill. 1990) ................................................................11

*Kazi v. PNC Bank, N.A,*
    No. 18-cv-04810 JCS, 2020 WL 607065 (N.D. Cal. Feb. 7, 2020) .........................17

*Kerr v. K Allred Oilfield Servs.,*
    No. 2:20-cv-00477 WJ SMV, 2020 WL 6799017 (D.N.M. Nov. 19, 2020)..................6

*Ling v. PF Chang's China Bistro, Inc.,*
    245 Cal. App. 4th 1242 (2016)..................................................................25

*Magadia v. Wal-Mart, Inc.,*
    384 F. Supp. 3d 1058 (N.D. Cal. 2019).........................................................24

*Maldonado v. Epsilon Plastics, Inc.,*
    22 Cal.App.5th 1308, 1336-1337 (2018)........................................................25

*Martinez v. Adir Int'l LLC,*
    No. CV-14-05505 ABP LAX, 2015 WL 12670519 (C.D. Cal. July 7, 2015) ..............5

*Mies v. Sephora*,
   234 Cal. App. 4th 967 (2015).....................................................................................13

*Morgan v. United Retail Inc.*,
   186 Cal. App. 4th 1136 (2010)..................................................................................24

*Naranjo v. Spectrum Sec. Servs.*,
   40 Cal.App.5th 444, 474 (2019), *review granted*, 455 P.3d 704 (2020)....................25

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. SW, Inc.*,
   926 F.3d 528 (9th Cir. 2019)......................................................................................10

*Oman v. Delta Air Lines, Inc.*,
   9 Cal.5th 762 (2020)................................................................................................7, 8

*Ontiveros v Safelite Fulfillment Inc.*,
   No. 15-cv-07118 DMG ROAx, 2017 WL 6043078 at * 10-11 (C.D. Cal. Oct.
   16, 2017)..........................................................................................................16, 17, 20

*Pryor v. Aerotek Scientific, LLC*,
   278 F.R.D. 516 (C.D. Cal. 2011)...........................................................................13, 16

*Raines v. Coastal Pac. Food Distribs., Inc.*,
   23 Cal.App.5th 667, 677 (2018)................................................................................24

*Ramirez v. TransUnion LLC*,
   951 F.3d 1008 (9th Cir. 2020) .............................................................................10, 23

*Ramirez v. Utd. Rentals*,
   No. 5:10-cv-04374 EJD, 2013 WL 2646648 (N.D. Cal. Jun. 12, 2013) ...........6, 8, 10

*Richmond v. Dart Indus., Inc.*,
   29 Cal. 3d 462 (1981).............................................................................................10, 11

*Rodman v. Safeway, Inc.*,
   No. 11-cv-03003 JST, 2014 WL 988992 (N.D. Cal. Mar. 9, 2014)...............................5

*Singletary v. Teavana Corp.*,
   No. 5:13-cv-01163 PSG 2014 WL 1760884 (N.D. Cal. May 2, 2014).......................25

*Szabo v. Bridgeport Machs., Inc.*,
   249 F.3d 672 (7th Cir. 2001), *cert denied*, 534 U.S. 951 (2001) ...........................5, 10

*Tokoshima v. Pep Boys*,
   No. 12-cv-04810 CRB, 2014 WL 1677979 (N.D. Cal. Apr. 28, 2014) ........................6

*Tseng v. Nordstrom, Inc.*,
   No. 2:11-cv-08471 CAS MRWx, 2014 WL 174946, at *5 (C.D. Cal. Jan. 15,
   2014)..........................................................................................................................16

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S.Ct. 1036 (2016) ...............................................................................13, 17

*Valdez v. Fairway Indep. Mortg. Corp.*,
    No. 18-cv-02748 CAB KSC, 2019 WL 3406912 (S.D. Cal. Jul. 26, 2019)................................23

*Vaquero v. Stoneledge Furniture LLC*,
    9 Cal. App. 5th 98 (2017).......................................................................9, 21

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .........................................................................5, 22, 24

*Washington v. Joe's Crab Shack*,
    271 F.R.D. 629 (N.D. Cal. 2010) .................................................................6, 23

*In re Wells Fargo Home Mortg.*,
    571 F.3d 953 (9th Cir. 2009) .......................................................................12

*In re Wells Fargo Litig.*,
    No. 08-MD-01930 MMC, 2011 WL 3903117 (N.D. Cal. Sept 6, 2011) ....................................22

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) .....................................................................12

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...................................................................5, 13

**Statutes**

Cal. Code Regs. § 11140(7)(A)(3) ....................................................................20

Labor Code section 226.2 ............................................................................22

**Other Authorities**

29 C.F.R. § 778.209(b) ................................................................................4

29 C.F.R. § 778.212 .................................................................................23

DLSE Manual §2.5.1 ...................................................................................6

Federal Rule of Civil Procedure 23(a)(4), (g) ...............................................5, 10, 12, 13

## I.   <u>INTRODUCTION</u>

Plaintiffs Erica Moniz, Hugo Gutierrez, Hagop Ajemyan and Phillip Gabriel ("Plaintiffs") pursue classes of Painters, Body Technicians, and Painters based on a false premise. They seek to certify classes of piece-rate and commissioned workers. However, Service King ("SK") paid employees on an hourly basis and paid for all hours work, including overtime. Some of SK's employees are eligible to earn additional compensation by way of productivity earnings. Importantly, however, no employee at issue received pay solely based on productivity (i.e., commission only or piece rate only). Despite this, Plaintiffs seek to certify classes on false pretenses based on a lawyer-driven theory that contradicts a mountain of evidence, including their deposition testimony, declarations, and wage statements. Notably, they effectively concede the pay structure is hourly by carving out weeks they received *only* hourly pay and by including a safety net: an alternative "overtime" subclass that acknowledges SK pays hourly. The contradictions are clear. However, Plaintiffs cannot certify a class on theories lacking evidentiary support, and the Court should not blindly certify the "piece rate" or "commission" classes on meritless grounds. Plaintiffs also lack standing to pursue these claims because SK paid them hourly.

It gets worse. Plaintiffs are inadequate representatives because none of them ascribe to their core theory of liability. Three admitted SK paid them hourly in prior complaints and at deposition, and the other contradicted himself *many times* on the issue. Their depositions further show they do not understand the theory of the case and repeatedly undermine it with theories of *hourly pay* they are not seeking to certify. Further, while Plaintiffs seek to represent Body Technicians, none worked as one. They are inadequate representatives, and at the very least, have claims atypical of the class.

The "piece rate" and "commission" classes fail for another reason. They provide no method for demonstrating liability on a class basis. Plaintiffs seek unpaid wages based on a theory of "non-productive" (i.e., meeting time) and unpaid rest time. They seek to establish it through "representative testimony," but the evidence and SK's expert shows these theories are individualized and fact-specific. On meeting time, they assume without analysis: (1) all meeting time qualified as non-productive time; (2) meeting time occurred each week; and (3) meeting time occurred in the weeks they seek to certify where they also received productivity pay, and not the other weeks where

they only received hourly pay (which they carve out of the class). Plaintiffs propose no manageable method to resolve these issues. Instead, their expert *assumes* liability and proposes hundreds of depositions to assess damages, which SK's expert makes clear will not work. The report suffers from the same failings resulting in a denial of certification on non-productive time for the same counsel and expert. In reality, there is wide variation in meeting time across the group, coupled with a lack of records and significant "recall error," which undercuts *liability and damages*. Regarding rest periods, Plaintiffs also provide no method to tether weeks with productivity pay to rest periods taken.

The derivative claims also fail because they rely on the failed theories of certification. Plaintiffs also resort to alternative theories of liability. However, this case is two years old, and the Court should not permit them to pursue contradictory theories of liability with the hope one sticks. The Court should also decline to certify the theories of meal premium pay and direct wage statement claims because they are contrary to established law and/or undermined by their own testimony.

For these reasons, and those that follow, the Court should deny the Motion.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs Worked for SK as Service Advisors and Painters

Erica Moniz ("Moniz") worked as a Service Advisor at the San Jose location after SK acquired it, from 2014 to October 2015. Moniz Decl. ¶2; Compendium of Evidence ("Evid. Comp.") Ex. 5; Moniz Deposition ("Moniz Depo"): 30:8-14. Hagop Ajemyan ("Ajemyan") worked as a Service Advisor at the Atwater Village location after SK acquired it, from December 2016 to July 2018. Ajemyan Decl. ¶2; Evid. Comp. Ex. 6, Ajemyan Deposition ("Ajemyan Depo"): 66:17-67:3, 71:1-3, 108:7-20. Hugo Gutierrez ("Gutierrez") worked as a Service Advisor at the Van Nuys location, from August 2017 to June 2018. Gutierrez Decl. ¶2; Evid. Comp. Ex. 7, Gutierrez Deposition ("Gutierrez Depo"): 125:5-12. Phil Gabriel ("Gabriel") worked as a Painter at primarily the Placentia location, from August 2017 to November 2018. Gabriel Decl. ¶ 2; Evid. Comp. Ex. 8, Gabriel Deposition ("Gabriel Depo"): 51:6-9, 57:3-58:7.

### B.   SK's Compensation Structure Pays for All Hours Worked

At all relevant times, SK paid Service Advisors, Body Technicians, and Painters an hourly wage (regular time and applicable overtime) for all hours worked. Evid. Comp. Ex. 4, McGimsey

Deposition ("McGimsey Depo"): 28:20-29:7, 39:5-16, 40:4-14. That is why they clocked their hours. *Id.*: 163:22-164:3; 166:6-18. SK never recovered any portion of hourly pay, and never paid an hourly rate less than minimum wage. Evid. Comp. Ex. 3, McGimsey Declaration ("McGimsey Decl.") ¶19.

In February 2020, SK eliminated the Service Advisor position. McGimsey Depo: 24:21-25:10. Prior to that time, Service Advisors (those at issue in the "commission class") had the ability to earn "Productivity Pay" on top of their hourly wage. They interfaced with customers about vehicle repairs, worked with the applicable insurance guidelines for covered vehicles, and saw repair orders through completion. Moniz Depo: 42:6-45:8, 60:1-65:24; Ajemyan Depo: 90:16-92:2; McGimsey Decl. ¶13. SK based Productivity Pay on a percent of vehicle repair orders. It paid a Service Advisor Productivity Pay based on an analysis of two formulas: (1) hourly wages (at the base hourly rate or the applicable overtime rate) for all hours worked ("Hourly Pay"); and (2) the set percentage (typically 5%) of value of vehicles repaired and delivered to the customer in a given week ("Percentage"). McGimsey Depo: 28:20-29:7, 36:3-19, 37:3-38:9, 39:5-16, 40:4-14, 46:17-47:1; McGimsey Decl. ¶19-22. After determining the value of Hourly Pay and the value of Percentage, SK compared the values. If Hourly Pay exceeded Percentage, the Service Advisor received Hourly Pay for all hours worked. McGimsey Depo: 28:20-29:7, 36:3-19, 37:3-38:9, 39:5-16, 40:4-14, 46:17-47:1; McGimsey Decl. ¶21. If Percentage exceeded Hourly Pay, the Service Advisor received Hourly Pay, *plus* Productivity Pay (the difference between Percentage and Hourly Pay). McGimsey Depo: 28:20-29:7, 36:3-19, 37:3-38:9, 39:5-16, 40:4-14, 46:17-47:1; McGimsey Decl. ¶21. SK also paid "additional overtime" on top of Productivity Pay if the Service Advisor worked overtime in that workweek, which adjusted the regular rate of pay. McGimsey Depo: 101:19-103:22; McGimsey Decl. ¶21. Those payments appear on the wage statements as "Addl OT." *Ibid.*

Under either scenario, ***the individual always received Hourly Pay (including overtime) for all hours worked***. McGimsey Decl. ¶19-22, 25. The only difference is whether the person received Productivity Pay on top. Two consecutive weeks of Ajemyan's wage statements provide an example:

4/13/2018

| Earnings | Rate | Hours | This Period | Year to Date |
|---|---|---|---|---|
| Regular | 16.0000 | 40.00 | 640.00 | |
| Overtime | 24.0000 | 20.42 | 490.08 | |
| Addl Ot | | 0.00 | 194.79 | |
| Californiabreak | 16.0000 | 5.00 | 80.00 | |
| Productivity | | 0.00 | 1,152.73 | |
| | Gross Pay | | $ 2,557.60 | 26,505.29 |

4/20/2018

| Earnings | Rate | Hours | This Period | Year to Date |
|---|---|---|---|---|
| Regular | 16.0000 | 40.00 | 640.00 | |
| Overtime | 24.0000 | 11.57 | 277.68 | |
| Californiabreak | 16.0000 | 4.00 | 64.00 | |
| | Gross Pay | | $ 981.68 | 27,486.97 |

OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1   Evid. Comp. Ex. 3.2. In week of 4/13, Ajemyan's Percentage exceeded Hourly Pay, so he received

2   Hourly Pay for all hours worked, plus Productivity Pay. He worked 60.42 clocked hours,[1] and

3   received total Hourly Pay (including overtime) of $1,130.08 ($640 + 490.08). He received additional

4   Productivity Pay of $1,152.73, making his total Percentage $2,282.81 ($1,130.08 + $1,152.73). *See*

5   McGimsey Depo: 37:3-38:9; McGimsey Decl. ¶ 21. Since SK paid him on an hourly basis, he also

6   received additional pay under the code "Addl OT" due to his receipt of Productivity Pay. *See*

7   McGimsey Depo: 101:19-103:22; McGimsey Decl. ¶ 21.[2]

8       In the week of 4/20, Ajemyan received solely Hourly Pay. *See* McGimsey Decl. ¶19-22. Each

9   week, SK evaluated these formulas, with the employee receiving the greatest possible amount under

10  the compensation structure. Critically, under either formula, the employee received Hourly Pay

11  (including applicable overtime) for all hours worked. McGimsey Depo: 28:20-29:7, 36:3-19, 37:3-

12  38:9, 39:5-16, 40:4-14, 46:17-47:1; McGimsey Decl., ¶19-22, 25.

13      The analysis is similar for Painters and Body Technicians. SK pays all Painters and Body

14  Technicians an hourly wage (including applicable overtime) for all hours worked. McGimsey Depo:

15  49:23-50:9; 52:20-53:8; 64:20-65:6; McGimsey Decl. ¶19-20, 23-25. Painters and Body Technicians

16  may also earn Productivity Pay in addition to their Hourly Pay, but SK bases their production on

17  different metrics because they have different jobs. Painters conduct tasks relating to refinishing and

18  painting vehicles. Gabriel Depo: 67:1-69:14; McGimsey Decl. ¶18. Body Technicians conduct

19  repairs on vehicles to fix collision damage. McGimsey Depo: 53:17-55:21; McGimsey Decl. ¶16.

20  For both positions, SK bases Productivity Pay on "flag hours" earned for work on vehicles, each of

21  which have an applicable "flag rate." McGimsey Depo: 53:17-55:21, 64:20-65:6; McGimsey Decl.

22  ¶23. Again, it pays a Painter or Body Technician Productivity Pay based on an analysis of two

23  formulas: (1) Hourly Pay for all hours worked; and (2) flag hours multiplied by the applicable flag

24  rate ("Flag Pay"). McGimsey Depo: 49:23-50:9; 52:20-53:8; 64:20-65:6; McGimsey Decl. ¶23.

25  After determining the value of Hourly Pay and Flag Pay, SK compares the values. If Hourly Pay

26

27  ---

    [1] In this example, the "Californiabreak" code pertains to meal premium payments.
28  [2] SK calculated "Addl OT" under the following formula: ((productivity pay / total hours work) x .5
    x number of overtime hours), or (($1,152.73 / 60.42 hours) x .5 x 20.42) = $194.79). *See* McGimsey
    Depo: 101:19-103:22; McGimsey Decl. ¶21. This formula is consistent with 29 C.F.R. § 778.209(b).

4

exceeds Flag Pay, the employee receives Hourly Pay for all hours worked. McGimsey Depo: 49:23-50:9; 52:20-53:8; 64:20-65:6; McGimsey Decl. ¶23. If Flag Pay exceeds Hourly Pay, the employee receives Hourly Pay, *plus* Productivity Pay (the difference between Flag Pay and Hourly Pay). McGimsey Depo: 49:23-50:9; 52:20-53:8; 64:20-65:6; McGimsey Decl., 23. SK also pays "additional overtime" on top of Productivity Pay to adjust the regular rate, as described above, if the person worked overtime in that workweek. McGimsey Depo: 101:19-103:22; McGimsey Decl. ¶23.

### III.   <u>LEGAL STANDARD</u>

Class representatives must prove numerosity, commonality, typicality, and adequate representation of the class under Federal Rule of Civil Procedure 23(a) ("Rule 23"). They also must establish "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods." Rule 23(b)(3); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). "At class certification, a court does not accept at face value a plaintiff's theory of the case." *Rodman v. Safeway, Inc.*, No. 11-cv-03003 JST, 2014 WL 988992, *6 (N.D. Cal. Mar. 9, 2014). The court must engage in a "rigorous analysis" into whether Rule 23 requirements are satisfied, and "frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

### IV.   <u>PLAINTIFFS CANNOT CERTIFY A CLASS BASED ON A FALSE PREMISE</u>

#### A.   <u>SK Pays Body Technicians and Painters on an Hourly Basis</u>

Plaintiffs' "piece rate" class and theory of certification rests on a false premise: that SK pays Painters and Body Technicians solely by the piece.

"Rule 23 is not a mere pleading standard." *Dukes*, 546 U.S. at 350-351. The Court must analyze if there is "in fact" support for the claims that form the basis for certification. *Id.* Many circuits bar district courts from presuming plaintiff's allegations "true for purposes of the class motion … without resolving factual and legal issues that strongly influence the wisdom of class treatment." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001), *cert denied*, 534 U.S. 951 (2001); *see Martinez v. Adir Int'l LLC,* No. CV-14-05505 ABP LAX, 2015 WL 12670519, at *4 (C.D. Cal. July 7, 2015). As the Court put it, "although the class certification procedure is not

the place to test the merits of a claim, ***it does not follow that a court must blindly certify a class on a clearly meritless ground***." *Ramirez v. Utd. Rentals,* No. 5:10-cv-04374 EJD, 2013 WL 2646648, at *6 (N.D. Cal. Jun. 12, 2013) (emphasis added). Even under the conditional certification standard, "at least some evidence beyond unsupported factual assertions must be presented" to support certification. *Kerr v. K Allred Oilfield Servs.*, No. 2:20-cv-00477 WJ SMV, 2020 WL 6799017, at *2 (D.N.M. Nov. 19, 2020). Alleged uniform policies do not support certification when they are *facially lawful. Washington v. Joe's Crab Shack,* 271 F.R.D. 629, 641 (N.D. Cal. 2010).

The Division of Labor Standards ("DLSE") defines "piece rate" work as "[w]ork paid for according to the number of units turned out," not by hours worked. DLSE Manual §2.5.1. Plaintiffs contend SK paid Body Technicians and Painters – on some weeks, but not all – "pursuant to an unlawful piece-rate compensation structure that does not separately compensate them for rest periods or non-productive time." Motion, 1:18-19; DuMond Report, pg. 10, 15 (carving out weeks with solely hourly pay).[3] They rely on *Bluford v. Safeway, Inc.*, 216 Cal. App.4th 864, 872 (2013) and *Gonzalez v. Downtown LA Motors*, LP, 215 Cal. App. 4th 36 (2013) ("*DTLA*"). However, the pay plans in those cases bear no resemblance to SK's. In *DTLA*, 215 Cal. App. 4th at 45, the employer compensated its employees by a piece-rate system that compensated employees by the task, not for all hours worked. Unlike here, the parties agreed on the compensation structure. However, the employer asked the court do a post hoc analysis by "averaging" the piece-rate compensation over all hours worked. The court rejected that argument, finding *DTLA* failed to provide for compensation for all hours worked when piece-rate wages fell below the minimum wage. *Id.* at 55. Similarly, in *Bluford*, 216 Cal. App. 4th at 870, the employer paid by an undisputed piece-rate compensation system that did not account for time on rest breaks.[4]

Plaintiffs' legal argument disregards the facts: ***SK's paystubs always reflect hourly compensation for all hours clocked, including rest breaks***. Evid. Comp. Ex. 2, Expert Report of

---

[3] Plaintiffs exclude weeks they received solely hourly pay because they know the plan is not actually a "piece rate" plan and know that paying by the hour is lawful.

[4] The same is true of the other cases cited in the Motion: they concern piece-rate pay. *Tokoshima v. Pep Boys*, No. 12-cv-04810 CRB, 2014 WL 1677979 (N.D. Cal. 28, 2014); *Aldapa v. Fowler Packing Co.*, 323 F.R.D. 316, 337 (E.D. Cal. 2018); *Cruz v. MM 879, Inc.*, 329 F.R.D. 639, 644-645 (N.D. Cal. 2019).

1   Hassan Assaf ("Assaf Report") ¶¶5, 26; McGimsey Depo: 49:23-50:9; 52:20-53:8; 64:20-65:6;

2   McGimsey Decl. ¶19-25. Evid. Comp. Ex. 1.1, Summary of Declaration Testimony ("Summ.") No.

3   3, 4.[5] SK's template offer letters also provide for hourly pay, plus productivity pay. Evid. Comp.

4   Exs. 4.1-4.3. SK also explained its compensation structure through its corporate representative.

5   McGimsey Depo: 28:20-29:7, 36:3-19, 37:3-38:9, 39:5-16, 40:4-14, 46:17-47:1, 49:23-50:9; 52:20-

6   53:8; 64:20-65:6; McGimsey Decl., ¶19-25. In stark contrast to cases cited in the Motion, no post

7   hoc averaging is necessary here to find compliance with minimum wages. While SK's compensation

8   structure permits earnings above hourly pay, it is lawful to pay production incentives.

9       Still, Plaintiffs claim the system is "piece rate" because in those weeks they earned

10  productivity pay, compensation can never exceed the productivity-based threshold. This argument

11  falls flat. In Plaintiffs' cited piece-rate cases, the employers *did not pay for all hours worked*. The

12  parties did not dispute that. That is not the case here. SK paid for all hours worked, always. Critically,

13  the California Supreme Court analyzed a similar argument in *Oman v. Delta Air Lines, Inc.*, 9 Cal.5th

14  762 (2020). It affirmed the lawfulness of a pay plan that used multiple formulas, but always paid at

15  least the minimum wage for all hours worked. *Id.* at 778, 783-784. Delta used four formulas by which

16  it paid its flight attendants. Some looked at hours worked, while others paid based on delineated

17  flight duty periods, and yet another formula analyzed the attendant's work rotation. *Id.* at 778. Delta

18  paid under the formula that provided the greatest amount. *Id.* The plaintiff claimed a minimum wage

19  violation because one formula compensated for flight time and did not factor the hours flight

20  attendants spend working on the ground before and after flights. *Id.* at 778. Notably, all formulas

21  guaranteed total compensation greater than minimum wage for all hours worked, *even though not all*

22  *paid for all hours worked. Id.* at 786. The California Supreme Court found this plan lawful. *Id.*

23      The pay structure here is actually simpler than in *Oman* because SK pays an hourly wage for

24  all clocked hours, irrespective of workweek. But significantly, the *Oman* court explicitly warns

25  against the request here: "the minimum wage laws exist to ensure that workers receive adequate and

26  fair pay, not to dictate to employers and employees what pay formulas they may, or may not, agree

27

28

---

[5] For the convenience of the Court, SK compiled this exhibit to summarize the declarant testimony.

1   to adopt as a means to that end." *Id.* at 789. "[A]n employer can, for example, pay by the day, with

2   daily pay averaged across all hours worked to determine whether the resulting hourly wage exceeds

3   the minimum." *Id.* at 782. *Oman* also allows an employer to pay, through one of the formulas, more

4   pay than that owed under an alternative formula, so long as the pay exceeds the minimum wage for

5   all hours worked. *Id.* at 786-87. Plaintiffs want the Court to ignore *Oman* now and address it after

6   certification.[6] However, they need *actual evidence* to support their "piece rate" claim, beyond mere

7   pleadings. They cannot manufacture a legal issue on falsehoods and certify the fiction.

8       Tellingly, Plaintiffs do not support the theory. Gabriel – the only alleged "piece-rate" plaintiff

9   – admitted he received hourly pay each week. Gabriel Depo: 82:18-84:2. His original complaint tells

10  the real story. Before joining this action, he filed his own suit on behalf of **non-exempt, hourly**

11  **employees**. Evid. Comp. 1.4 (Complaint, ¶ 15). The other Body Technician SK deposed admitted the

12  same: he received an hourly pay, *plus additional pay based on production*. Evid. Comp. Ex. 9, Meza

13  Deposition: 22:7-21. All Painter and Body Technician declarants confirm SK paid them an hourly

14  wage for all hours worked, plus additional productivity pay on top of this amount. Summ. No. 1, 3.

15      In short, it is clear to all but Plaintiffs' counsel that SK did not pay Painters and Body

16  Technicians by "the piece." Plaintiffs thus effectively present the Court with a "piece rate" class of

17  none. This not only means the proposed class lacks numerosity, it means they present a theory of

18  certification that lacks factual support. The Court should reject Plaintiffs' invitation to plod forward

19  blindly on a theory of certification that lacks factual support. *Ramirez,* 2013 WL 2646648, at *6.

20      **B.   SK Paid Service Advisors on an Hourly Basis**

21      The "commission class" also rests on a false premise: that SK paid Service Advisors on a

22  commission-only basis. Motion, 10:10. Plaintiffs analogize SK's compensation structure to *Vaquero*

23  _____

24  [6] The Court of Appeal analyzed a similar pay plan in *Certified Tire & Serv. Centers Wage & Hour Cases* 28 Cal.App.5th 1, 6, fn. 8 (2018), *review granted*, Jan. 16, 2019. While vacated in light of

25  *Oman*, it is still instructive. There*,* the employer paid technicians on one of two formulas. It paid a guaranteed hourly rate above minimum wage for every hour worked. Alternatively, it paid at a higher

26  rate based on a formula that "reward[ed]" the technicians for work billed as a "labor charge," referred to as "the technician's 'production dollars.'" *Id.* at 4. The production formula took the production

27  dollars, multiplied them by a "tech rate," and divided by total hours worked in that pay period to arrive at a different "base hourly rate." The "base" rate derived from productive work. If the "base"

28  rate exceeded the minimum guaranteed hourly rate, the technician received the base hourly rate for all hours. Otherwise, the technician earned the minimum guaranteed hourly rate for all work. *Id*. at 4-5. The court found this pay plan lawful and distinguished it from *DTLA* and *Bluford*. *Id.* at 13.

1  *v. Stoneledge Furniture LLC*, 9 Cal. App. 5th 98 (2017), but once again, the facts get in the way of

2  the argument. In *Vaquero*, the parties agreed the employees were paid solely by a draw against

3  commissions. The employer then offset the draw against future commissions, clawing back this pay.

4  *Id.* at 115. Commission payments were based on a percentage of sales, and did not include

5  compensation for non-selling time or rest breaks. *Id.* at 115. The *Vaquero* court held that the pay

6  plan violated California law because by recovering the draw against commissions, it only

7  compensated for sales work, not other work. *Id.* at 114-15.

8          Plaintiffs' reliance on *Vaquero* again shows the theory of certification rests on fiction.

9  *Vaquero*'s compensation scheme never paid for rest breaks or non-sales work. SK's does. Regardless

10  of whether a Service Advisor received productivity pay, the advisor received hourly pay for all hours

11  worked, including paid rest breaks. McGimsey Depo: 28:20-29:7, 36:3-19, 37:3-38:9, 39:5-16, 40:4-

12  14, 46:17-47:1; McGimsey Decl. ¶ 19-22. The wage statements, offer letters, and SK's testimony

13  prove this. *Id.*; Assaf Report ¶¶5, 26; see Evid. Comp. Exs. 4.1, 4.2, 4.3. Unlike the employer in

14  *Vaquero*, SK's plan never offset such hourly pay against productivity pay.

15          *Vaquero* actually underscores why this distinction is so critical. The employer in *Vaquero*

16  later abandoned its draw-against-commission system and replaced it with one that paid an hourly

17  wage, *plus* additional incentive pay. *Vaquero*, 9 Cal. App. 5th at 103-04. *When the employer adopted*

18  *a pay structure like the one here, the plaintiffs excluded that from the class period.* The Court of

19  Appeal also distinguished between the unlawful draw-against-commission and the new system,

20  which paid for "all hours worked." *Id.* at 103-04. Plaintiffs ignore this in their analysis.[7]

21          Ajemyan and Gutierrez, both of whom worked as Service Advisors, ***freely admitted SK paid***

22  ***them hourly in their original complaint***, before joining this action. Evid. Comp. Ex. 1.2 (Complaint,

23  ¶ 24). Ajemyan admitted he and other Service Advisors received hourly pay, plus additional

24  productivity pay. Ajemyan Depo: 41:8-10, 41:15-17; 86:24-89:8. Moniz agrees. Moniz Depo: 41:7-

25  24.[8] The other Service Advisors SK deposed also admitted they received an hourly wage, *plus*

26

27  ───────────────

[7] *Kang v. Wells Fargo Bank, N.A.*, No. 17-cv-06220 BLF, 2019 WL 468818, at *5 (N.D. Cal. Feb. 6, 2019) also involved a draw-against-commission compensation system, just like *Vaquero*.

28  [8] Plaintiffs admit that in weeks where they received productivity pay, they also received additional "overtime pay" (i.e., hourly pay). Ajemyan Decl. ¶ 6; Gutierrez Decl. ¶ 5; Moniz Decl. ¶ 2.

*productivity pay.* Evid. Comp. Ex. 10, Edwards Depo: 97:21-98:6, 100:22-101:25; Evid. Comp. Ex. 11, Torrecillas Depo: 58:13-59:6. Each Service Advisor declarant confirmed this: SK paid them an hourly wage for all hours worked, plus additional productivity pay. Summ. No. 2, 3.

Just like the "piece rate" class, the Court should not ignore the evidence and certify a case based on manufactured facts. *Ramirez,* 2013 WL 2646648, at *6; *Szabo,* 249 F.3d at 675.

## V.   PLAINTIFFS LACK STANDING TO PURSUE CLASS CLAIMS BASED ON CONDUCT THAT THEY DID NOT EXPERIENCE

For these same reasons, Plaintiffs lack standing to pursue their "piece rate" and "commission" classes. A plaintiff must have standing to bring a claim to serve as a class representative. *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1023 (9th Cir. 2020). A class representative lacks standing where he or she did not suffer the harm they seek to certify and thus are not a member of the class. *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. SW, Inc.*, 926 F.3d 528, 532 (9th Cir. 2019) ("If the individual plaintiff lacks standing, the court need never reach the class action issue.").

Plaintiffs received hourly pay (including applicable overtime) for all clocked hours each pay period. There can be no dispute about that given the documents and testimony. Since SK did not pay Plaintiffs by the piece or solely by commission, they lack standing to pursue these claims.

## VI.   PLAINTIFFS ARE INADEQUATE, ATYPICAL CLASS REPRESENTATIVES

A representative must protect the interests of the class, fairly and adequately. Fed. R. Civ. P. 23(a)(4), (g). Where it is likely plaintiff might testify against the interest of other class members, antagonism exists to a degree that defeats certification. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625–627 (1997); *Richmond v. Dart Indus., Inc.,* 29 Cal. 3d 462, 470 (1981). Credibility is a second factor when determining the adequacy of the representative. *Kandel v. Brother Int'l Corp.*, 264 F.R.D. 630, 634 (C.D. Cal. 2010). A plaintiff who is willing to give "false and misleading testimony in an effort to further his interests" is not an adequate representative. *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510 (N.D. Ill. 1990); *Jovel v. Boiron*, No. 11-cv-10803, 2014 WL 1027874, at *3–13 (C.D. Cal. Feb. 27, 2014). Here, Plaintiffs are inadequate class representatives for three reasons.

**First**, Plaintiffs do not support their core theory that SK treated them as "piece rate" or "commission" employees. Ajemyan and Gutierrez submitted a complaint admitting SK treated them and other Service Advisors as hourly employees. Evid. Comp. Ex. 1.2 (Complaint, ¶ 24) ("Class

Members are non-exempt employees paid on an hourly-plus-commission basis."). Tellingly, this prior complaint alleged no minimum wage violation. *Id.*, *see also* Ajemyan Depo: 46:25-48:15; Gutierrez Depo: 73:8-75:8. Ajemyan and Moniz admitted SK paid them hourly. Ajemyan Depo: 41:8-10, 41:15-17, 86:24-89:8; Moniz Depo: 41:7-24. Gabriel also originally filed a complaint seeking recovery on behalf of *non-exempt, hourly employees*, and admitted SK paid him hourly. Evid. Comp. Ex. 1.4 (Gabriel Complaint, ¶ 15); Gabriel Depo: 82:18-84:2. Plaintiffs' testimony contradicts their core theory SK paid them by the piece or commission. This conflict goes to the "very subject matter" of the litigation. *Richmond*, 29 Cal.3d at 470. Given their admissions, either Plaintiffs are inadequate representatives, or they are atypical of the claims advanced. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). Both are grounds to deny certification.

**Second**, Plaintiffs lack knowledge of the claims and advanced inconsistent theories:

| |
|---|
| 1.      Ajemyan lacked independent knowledge of the claims. He had handwritten notes *provided by his counsel* about what he should say. They explained what a "class action" is, reminded him he represented "Body Techs" though he never worked as one, explained the concept of "commission," and even listed the violations he pursued. Ajemyan Depo: 13:13-17:10. |

| |
|---|
| 2.      Ajemyan flip-flopped on the core theory of the case. He said SK paid him "hourly plus commission" in his original complaint, but then said in his declaration supporting certification SK paid him on a "commission basis," before the admitting SK paid him hourly plus commission at his deposition. *Compare* Ajemyan Depo: 40:19-41:17, 88:3-18 *with* Ajemyan Decl. ¶ 3. He admitted the statement in his declaration is "entirely incorrect." Ajemyan Depo: 19:22-25:7. This "false and misleading testimony" cuts against adequacy. *Kaplan*, 132 F.R.D. at 510. |

| |
|---|
| 3.      Moniz claimed SK paid her on a "commission basis" based on a conversation with manager Art Shieck. Moniz Decl. ¶ 2. However, Moniz admitted she could not recall if she spoke to Mr. Shieck regarding her pay at SK or not. Moniz Depo: 87:12-20. She also admitted she received hourly pay each workweek, undercutting her declaration. Moniz Depo: 41:7-24. |

| |
|---|
| 4.      After filing the Complaint that states SK paid him "hourly plus commission," (Evid. Comp. 1.2, Complaint ¶ 24), Gutierrez vacillated between saying SK paid him commission only, by the hour, or some combination of the two. He changed his mind at least *twelve times*. Gutierrez Depo: 26:6-12 (commission only), 63:19-22 (commission only), 64:5-15 (hourly pay), 64:25-65:7 (not hourly), 65:8-17 (hourly) 67:4-17 ("essentially commission"), 68:2-18 (commission), 70:17-71:23, 72:22-73:4 (admitting his original lawsuit truthfully alleged SK paid him hourly plus commission), 82:17-83:18 (saying the same statement is false), 84:10-85:4 (same statement is true). 86:7-14 (not sure if statement is true or false), 89:19-90:6 (same statement is false), 93:21-96:4 (paid "basically commission"). Gutierrez has no information either way on his claims. |

| |
|---|
| 5.      Gutierrez and Gabriel focused their deposition on theories they are not pursuing. They discussed time they spent working but not clocked in. Gutierrez Depo: 105:7-106:11; Gabriel Depo: 83:19-84:1. This suggests either a lack of understanding of the claims, or a conflict between their class claims and their contentions (which pertain to hourly pay). "[A] putative representative cannot adequately protect the class if his [or her] interests are antagonistic to" the class. *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007). |

**Third**, Plaintiffs are inadequate to represent Body Technicians because none of them ever worked as one. They largely did not know how SK paid Body Technicians. Ajemyan, Gutierrez, and Moniz did not even know what piece rate pay is, and two mistakenly thought SK paid Body Technicians commissions as a percent of total repair orders. Moniz Depo: 94:9-18, 122:21-123:5; Ajemyan Depo: 41:2-7, 41:18-42:5; Gutierrez Depo: 130:4-24. Gabriel indicated SK paid Body Technicians "hourly plus commission," which contradicts the theory that SK treated them as "piece rate" employees. Gabriel Depo: 133:6-12. The only alleged "piece rate" employee (Gabriel) testified he generally did not observe Body Technicians' rest practices or work and could not speak to the reasons why they did not attend meetings. Gabriel Depo: 66:23-25, 112:14-24, 129:6-15.

## VII. INDIVIDUALIZED ISSUES REGARDING MEETING TIME FORECLOSE CERTIFICATION OF "PIECE RATE" AND "COMMISSION" CLASSES

The "piece rate" and "commission" classes also give rise to numerous individualized, unmanageable issues regarding "non-productive work" for which courts routinely deny certification.

### A. The Court Cannot Certify the "Piece-Rate Class" Because Liability Cannot Be Determined on a Class-Wide Basis and Individual Issues Predominate

To certify a class, liability cannot depend on individualized inquiries. While there is substantial overlap between the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance tests, "the 23(b)(3) test is 'far more demanding.'" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). "[T]he 'notion that the adjudication of common issues will help achieve judicial economy' is an integral part of the predominance test." *In re Wells Fargo Home Mortg.*, 571 F.3d 953, 958 (9th Cir. 2009). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized classwide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (internal citations omitted). If the issues in a case require individualized assessment, a Rule 23(b)(3) action is inappropriate. *Zinser*, 253 F.3d at 1190. Critically, "*[t]he inquiry into what work is actually done … can be heavily individualized*." *Mies v. Sephora*, 234 Cal. App. 4th 967, 979 (2015) (emphasis added); *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 533 (C.D. Cal. 2011); *Brown v. Fed. Expr. Corp.*, 249 F.R.D. 580, 587 (C.D. Cal. 2008).

The individual questions as to the "piece rate" class exist in droves. Plaintiffs skip this analysis altogether. Motion at 19:27-20:5. Tellingly, their expert contends:

> [T]o establish **liability and damages**, randomly selected members of the Piece-Rate and Commission Classes could be deposed by both Plaintiffs and Service King, subject to cross-examination, as to the issues of: (1) whether they worked any "non-productive" hours at all in the form of attending meetings, and (2) if so, the amount "non-productive" hours they are owed from attending these meetings. Consistent with *Tyson Foods*, the results of this sampling would provide the basis for trying **damages** attributable to this "non-productive" work. DuMond Report, pp. 10-16 (emphases added).

Plaintiffs hope the Court will overlook their sleight of hand. The DuMond Report expressly states it is only addressing *damages only, not liability*. DuMond Report, pg. 3, fn. 5. In other words, they assume liability and provide a flawed methodology to assess damages. By doing so, they ignore numerous individual issues, as discussed by SK's expert. Assaf Report ¶¶6, 8-16-24, 28-31.

Plaintiffs' theory on meeting time for the "piece rate" class is: (1) SK did not separately compensate them for meeting time; (2) such meeting time qualified as "non-productive work"; and (3) meeting time occurred regularly. All three premises are flawed. Even ignoring the "piece rate" fiction, liability occurs only in a workweek if the person (1) received productivity pay; (2) had meeting time in the week; and (3) that alleged time qualified as non-productive work.

**Plaintiff Ignore the First Threshold Question:** Plaintiffs and their other declarants largely refer to meetings as "Productivity Meetings." *See* Gabriel Decl. ¶ 4; ECF 45-1, Marcial Decl. ¶ 3; ECF 45-1 Meza Decl. ¶ 3; ECF 45-1 Niebla Decl. ¶ 3; ECF 45-1 Cedeno Decl. ¶ 2. This begs the question: Do "Productivity Meetings" constitute "non-productive time?" Consider:

- *Painters and Body Technicians Admit the Meetings Focused on Production.* Gabriel (the only plaintiff in the "piece rate class") admits meetings focused on "production" and ensuring vehicles move efficiently through the repair process. Gabriel Depo: 90:4-6. SK's General Managers ("GMs"), Body Technicians, and Painters confirm "meetings" (or check-ins as they refer to them) focused on repairs to *increase* efficiency. Summ. No. 5, 6. Further, if meetings concerned something other than production, the topics varied and there is no meeting records. Summ. No. 7, 11.

- *Painters and Body Technicians Work on a Team, Which Means They May Still Accrue Flag Hours During Meetings.* Some Body Technicians and Painters work on teams. These teams accrue productivity in the form of "flag hours" and share the proceeds based on splits determined by

1  each team. McGimsey Depo: 53:17-55:21, 64:20-65:6; McGimsey Decl. ¶23; Summ. No. 8; Assaf

2  Report ¶24. Not everyone on the team attends the same meetings; often just the "lead" attends.

3  Summ. No. 9. In these instances, while one member of a team is in a meeting, the team can accrue

4  productivity due to others' work, making such time "productive" time.

5  • *Painters and Body Technicians Conduct Work During Check-Ins*. Body Technicians

6  and Painters worked during check-ins, making it productive time. Summ. No. 10; Assaf Report ¶24.

7  • *It is Impossible to Analyze Whether Meetings Qualify as "Productive Time"*

8  *Collectively*. To evaluate the meeting time theory for the "piece rate" class, one must ask a number

9  of questions to each Painter and Body Technician for each workweek: Did you have a meeting or

10  check-in? What topic did it cover? Did you conduct work during the meeting? Did you work on a

11  team? If so, did each team member attend? If not, did any team member conduct work during the

12  meeting? As noted by SK's expert, there is no way to answer these questions because no records

13  exist as to when the meetings happened, the topics discussed, or who attended. Assaf Report ¶¶17,

14  19, 24, 54-59; Gabriel Depo: 89:23-90:3; Ex. Comp. Ex. 9 Meza Depo: 52:19-53:15; Summ. No. 11.

15  **Plaintiffs Ignore the Second Threshold Question:** Plaintiffs next assume Painters or Body

16  Technicians had check-ins or meetings each week. However, the evidence contradicts the argument:

17  • *Plaintiffs Skipped Meetings, Had Weeks With No Meetings, and Provided Inconsistent*

18  *Testimony*. In reality, the productivity of Painters and Technicians varies widely not only person-to-

19  person, but for each person, by week. Assaf Report ¶¶6, 8-11, 12-15, 18-19. This alone suggests

20  productivity and meeting time varied by week. *Id.* Plaintiffs' testimony supports this. Gabriel

21  declared, "During my time at Service King, I was required to attend weekly meetings every

22  Wednesday afternoon, which usually lasted approximately 20-30 minutes. Some weeks we had up

23  to two mandatory lunch meetings, which also lasted about 1- 1.5 hours." Gabriel Decl. ¶ 4. However,

24  during deposition, he conceded meetings varied weekly. Gabriel Depo: 86:20-87:5, 89:16-22. Some

25  weeks he would skip the meeting if, for example, he had a "deadline." *Id.*: 88:2-89:10, 114:10-24.

26  He also admits some weeks he had no meetings, has no records of the meetings to assess this, and

27  that meetings differed in lengths. *Id.*: 89:23-90:3, 94:25-95:19, 96: 7-97:3.

28

- *Others at Gabriel's Shop and on His Team Provided Vastly Different Testimony About Meetings.* Gabriel worked on a team with Ryan Frank. Gabriel Depo: 59:7-13. Frank offered a vastly different account of meetings, including variation in meeting time. Evid. Comp. 23, ¶9-12.

- *Others Reported Vastly Different Experiences at Meetings*:

| |
|---|
| The number of meetings, if any, varied by location. Summ. No. 12; Assaf Report ¶6. |
| The meetings varied by manager, even at the same location. Summ. 13; Assaf Report ¶¶21-23. |
| Some Painters and Body Technicians report shop meetings occurred on an infrequent basis and did not occur each week. Summ. No. 14. |
| Meetings varied by workload and shop demand. Painters and Body Technicians report that in busier weeks that they could earn more productivity pay, they had less or no meetings. Others report the opposite. Summ. No. 15; Assaf Report ¶¶ 15-16. |
| Meetings varied depending on the year. Since early 2020, given the COVID-19 pandemic, many locations have largely ceased holding shop meetings. Summ. No. 16; Assaf Report ¶16. |
| Painters and Body Technicians at the same shop report vastly different experiences as to meetings and meeting time, which suggests individual variation. Summ. No. 17; Assaf Report ¶¶ 21-23. |
| Painters and Body Technicians provide contradictory estimates regarding meeting time, which suggests "recall error." Assaf Report ¶42. This serious issue undermines the reliability of representative testimony, as do numerous other issues referenced by SK's expert, such as "generic memory" flaws, "telescoping error," and "self-selection error." Assaf Report ¶¶ 33-50. |

- *SK's General Managers Reported Different Experiences in Meetings Held.* Some GMs do not have regular check-ins with Painters or Body Technicians, because they are experienced, self-sufficient, and know what they need to do. Summ. No. 18. Others check in more regularly, but on a one-on-one basis, which would not apply across the board. Summ. No. 19.

- *Impossible to Answer These Individual Questions Collectively.* Plaintiffs do not propose a realistic way to deal with the individual questions. Their expert's solution is to depose no less than 50 Body Technicians and Painters, then do more depositions in intervals of 50, and construct an average. DuMond Report, pg. 13-14 (at "B" and "C"). That creates more problems than solutions. Aside from the massive amount of time it would take, *as SK's expert notes, the testimony would not be enough nor would it be representative.* Assaf Report ¶¶6, 10, 11, 31-50, 54-59. The proposed method will create "false positives" by assuming liability in all workweeks when Painters and Body Technicians admit they did not have meetings each week. *Id.* ¶¶57-59. It also ignores the serious issues of "recall error" and "generic memory" flaws by asking Painters and Body Technicians to recall the amount of meeting time by week for a period of four years, where such time varied by

1    week and no records exist. *Id.* ¶¶ 33-59. As SK's expert confirms, Plaintiffs' proposal is untenable

2    and will not produce representative testimony to resolve the issue on a class basis. *Id.*

3         **Plaintiff Ignore the Third Threshold Issue**: Plaintiffs' "piece rate" theory focuses on weeks

4    where persons actually receive productivity pay, not where they solely earn hourly pay. DuMond

5    Report, pg. 10. While the wage statements identify those weeks with productivity earnings, ***Plaintiffs***

6    ***critically propose no method to tether weeks with meeting time to weeks with productivity pay***. No

7    records exist of showing which weeks had "non-productive time" and which did not. More important,

8    the evidence shows meeting time varied depending on the shop's workload and putative class

9    members stood to have more production in slower weeks. Summ. No. 20; Gabriel Depo: 88:2-89:10,

10   114:10-24; Assaf Report ¶¶15-16.The only way to determine liability would be to: (1) find each

11   week where a Painter or Body Technician had productivity pay; (2) for that specific week, ask if he

12   or she recalls any meetings; (3) ascertain the length of any such meetings; and (4) go through the

13   above questions to determine if this is non-productive time or not.

14        Courts routinely deny certification where such individual issues regarding employee time and

15   job duties predominate. *Tseng v. Nordstrom, Inc.,* No. 2:11-cv-08471 CAS MRWx, 2014 WL

16   174946, at *5 (C.D. Cal. Jan. 15, 2014) (denying certification based on variations between

17   locations); *Pryor*, 278 F.R.D. at 533 (denying certification where the individual issues regarding

18   employee time will dominate); *Brown*, 249 F.R.D. at 587 (same). Notably, ***counsel has had class***

19   ***certification denied for this reason in a different "non-productive" time case***. *Ontiveros v Safelite*

20   *Fulfillment Inc.*, No. 15-cv-07118 DMG ROAx, 2017 WL 6043078 at * 10-11 (C.D. Cal. Oct. 16,

21   2017). Counsel retained the same expert for that case. There, like here, "a putative class member's

22   recovery [hinged] upon two conditions: (1) the technician completed nonproductive tasks during the

23   workweek … *and* (2) the technician [had productivity pay] that week." *Id.* at *10. Thus, the same

24   expert recommended deposing a representative sample to get an average of "nonproductive hours."

25   The court found this inadequate and denied certification. *Id.* Other courts have done the same, finding

26   that "pursuing claims based on nonproductive working time would require virtually a full trial for

27   each [person] as to when and how they worked, what records they or [employer] might have retained,

28   whether the [person] remembers how long they spent in meetings and training sessions, and whether

they recall working … during that time." *Kazi v. PNC Bank, N.A*, No. 18-cv-04810 JCS, 2020 WL 607065, at *8 (N.D. Cal. Feb. 7, 2020). This Court should too.[9]

**B.**   **The Court Cannot Certify the "Commission Class" Because Liability Cannot Be Determined on a Class-Wide Basis and Individual Issues Predominate**

Plaintiffs' theory on meeting time regarding the "commission" class parallels that of the "piece rate" class and certification is improper for the same reasons. It rests on the same flawed premise that (1) SK paid "commission" and did not separately compensate for meeting time; (2) such meeting time qualified as "non-productive work;" and (3) meeting time occurred regularly.

**Plaintiff Ignore the First Threshold Question:** Plaintiffs assume all meetings qualified as "non-productive" time. Yet, they call them "Productivity Meetings." Moniz Decl. ¶ 4; ECF 45-1, Edwards Decl. ¶ 4; ECF 45-1, Centeno Decl. ¶ 4; ECF 45-1, Torrecillas Decl. ¶ 4. Consider:

- *Many Service Advisors, Including Plaintiffs, Admit the Meetings Helped Their Production*. Moniz, Ajemyan, and Gutierrez acknowledge the meetings focused on "production" and ensuring vehicles move efficiently through the repair process. Ajemyan Depo: 93:19-24, 96:3-18; Gutierrez Depo: 141:5-142:11, 151:16- 153:9; Moniz Depo: 52:1-25, 115:8-14; Ajemyan Decl. ¶ 7, 8; Gutierrez Decl. ¶ 6; Moniz Decl. ¶ 4; Summ. No. 21. SK's GMs confirm this fact: the purpose of meetings is to discuss the status of repairs and ensure they moved smoothly, and believe they increased production. Summ. No. 22. Service Advisors oversaw repairs and received productivity pay as a percent of these completed repair orders, so the meetings advanced these repairs.

- *Repairs Occurred During Meetings Increasing Productivity Pay*. Service Advisors did not complete repairs; they oversaw the process. This means that during meetings, other team

---

[9] In this regard, Plaintiffs' reliance on *Tyson Foods* is severely misplaced. There, the court found a plaintiff can use representative evidence if "each class member could have relied on that sample to establish liability if he or she had brought an individual action…" 136 S. Ct. at 1046–47. The plaintiffs sued for unpaid "donning and doffing" and offered representative evidence *common to the class* that allowed them to establish the employer's "classwide liability." *Id*. at 1042, 1046. This case differs from *Tyson Foods* because Plaintiffs cannot provide a common method of proof to establish class liability. The meeting time claim is plagued with individual variability that goes to liability for each workweek and an inability to link productivity weeks to non-productive time. Only 68.7% of weeks included productivity pay, and with three separate job positions at issue, the issues in liking alleged non-productive time to productivity pay are "***more significant here***" than in *Ontiveros*, where the court denied certification. Assaf Report ¶32 (emphasis added).

members continued to work on the repairs, making this time productive. McGimsey Decl. ¶14; Ajemyan Depo 94:7-24; Gutierrez 141:17-142:7; Summ. No. 23.

- *Service Advisors Continued Working During Check-Ins.* Similarly, many Service Advisors conducted work during check-ins or meetings (such as revising or completing repair orders). Summ. No. 24. This work helped them advance the repair order and earn productivity pay.

**Plaintiffs Ignore the Second Threshold Question:** Plaintiffs assume Service Advisors had check-ins or meetings each week, but the evidence is highly individualized. Consider:

- *Plaintiffs Skipped Meetings, Had Weeks With No Meetings, and Provided Inconsistent Testimony.* Moniz **did not** have production meetings every week. Moniz Decl. ¶ 4; Moniz Depo: 52:1-11. Since SK paid her weekly, this means some pay periods she had no meetings. Ajemyan believed he had daily scheduled meetings and his meetings differed vastly from those of Moniz. Ajemyan Depo: 95:5-14, 98:15-23; *see also* Gutierrez Depo: 140:21-141:4. Even for those with scheduled meetings, they would sometimes skip or leave meetings to attend customer needs. Ajemyan Depo: 100:4-17; Moniz Depo: 114:1-115:5. However, Plaintiffs have no records of when meetings took place or times they skipped meetings or the length of such meetings. Ajemyan Depo: 103:11-19; Gutierrez Depo: 123:12-25, 165:6-17; Moniz Depo: 115:22-116:1; Summ. No. 25. They also admit the length of any meetings varied by week. Gutierrez Depo: 161:3-7, 164:6-13; Moniz Depo: 114:1-115:5. Gutierrez's recollection on the length of meetings varied, showing "recall error." *Compare* Gutierrez Depo: 161:3-7 (30 minutes to 1.5 hours) *with* Gutierrez Decl. ¶ 6 (maximum of an hour). The same is true of deponent Edwards. *Compare* Evid. Comp. Ex. 10, Edwards Depo 64:10-25 (20-45 minutes) *with* Edwards Decl. ¶ 4 (30-45 minutes). This undermines their ability to provide representative testimony. Assaf Report ¶¶33-42.

- *Other Service Advisors Reported Vastly Different Experiences at Meetings*:

| |
|---|
| The number/duration of meetings, if any, varied by location. Summ. No. 26; Assaf Report ¶¶6, 22. |
| The meetings varied by manager, even at the same location. For example, some managers did not have daily check-ins, but only held shop meetings, which did not occur weekly. Summ. No. 27. |
| Some Service Advisors met one-on-one, which means the meetings would vary by person. Summ. No. 28; Evid. Comp. Ex. 11, Torrecillas Depo 62:3-63:11. Others reported shop meetings did not occur weekly, and occurred on an infrequent basis. Summ. No. 29. Others reported missing or skipping meetings for various reasons, such as attending to customers or meeting with insurance adjusters. Summ. No. 30; Evid. Comp. Ex. 11, Torrecillas Depo: 52:21-54:5; Assaf Report ¶16. |

1    •    *Impossible to Answer These Individual Questions Collectively*. Once again, Plaintiffs

2    fail to propose a way to address the individual questions. Their expert's solution is to depose

3    hundreds of persons and then construct an average. DuMond Report, pg. 12-14; Assaf Report ¶31.

4    This creates "false positives" by assuming liability in all workweeks when Service Advisors like

5    Moniz admit they did not have meetings each week. *Id.* ¶¶57-59. It next ignores the serious issue of

6    "recall error," "recall" bias, and "telescoping" error by asking Service Advisors to recall the amount

7    of meeting time by week for a period of four years, where such time varied by week and by manager,

8    and no records exist. Assaf Report ¶¶ 33-50. As SK's expert confirms, the proposal of over 100

9    depositions would be woefully inadequate to resolve these issues. *Id.* ¶¶54, 57-59.

10    **Plaintiffs Ignore the Third Threshold Issue:** The "commission" theory focuses on weeks

11    where persons actually receive productivity pay, not where they solely earn hourly pay. DuMond

12    Report, pg. 14-16. While the wage statements identify those weeks with productivity earnings,

13    ***Plaintiffs propose no method to tether weeks with meeting time to weeks with productivity pay***. No

14    records exist of showing which weeks had "non-productive time" and which did not. More important,

15    meeting time varied depending on the shop's workload and Services Advisors stood to have more

16    production. For example, Moniz and others note that meetings occurred less in busy weeks where

17    they stood to make more in productivity pay. Moniz Depo: 66:5-18, 114:1-115:5; Torrecillas Depo

18    62:3-14; Summ. No. 31; Assaf Report ¶16. Ajemyan reported the opposite, while Gutierrez said it

19    varied by week. Ajemyan Depo: 92:22-96:19, Gutierrez Depo: 164:6-13. The only way to determine

20    liability is to: (1) find each week a Service Advisor had productivity pay; (2) for that specific week,

21    ask if he or she recalls meetings; (3) ascertain the length of any such meetings; and (4) go through

22    the above questions to determine if this is non-productive time or not. This will result in

23    individualized inquiries, especially as Service Advisors only received productivity pay in 56.5% of

24    weeks and *had the largest amount of standard deviation by week*. Assaf Report ¶¶28-30, fn. 27.

25    Like the "piece rate" class, Plaintiffs cannot prove non-productive time on a classwide basis.

26    **C.    The Court Cannot Certify the "Piece Rate Class" or "Commission Class"
Because Damages Cannot Feasibly Be Determined on a Class Basis**

27    Where plaintiffs have not "demonstrated that … damages [attributable to the plaintiffs'

28    theory] can be measured on a classwide basis, the predominance requirement is not satisfied." *Doyle*

1    *v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016); *see also Comcast Corp. v. Behrend*,

2    569 U.S. 27, 24 (2013).

3         Individualized issues also prevent a calculation of damages. Plaintiffs seek to certify

4    "commission" and "piece rate" classes. These require *separate* analyses based on the distinctions

5    highlighted above. This effectively doubles the number of depositions found unacceptable in

6    *Ontiveros.* Assaf Report ¶¶31-32. Moreover, the variability in alleged meeting time is enormous.

7    The variation makes it impossible to utilize the proposed methodology for determining damages, and

8    far more challenging that in *Ontiveros*. *Id.* ¶¶31-32, 54, 57-59. Given the lack of records and

9    individualized, week-by-week issues presented, the only way to determine damages would be to

10   depose all or nearly all class members. *Id*. As discussed in *Ontiveros,* this precludes certification.

11   **VIII.**    <u>**INDIVIDUALIZED ISSUES REGARDING UNPAID REST TIME FORECLOSE**</u>
<u>**CERTIFICATION OF THE "PIECE RATE" AND "COMMISSION" CLASSES**</u>

12

13         The "piece rate" and "commission" classes also require individualized inquiries regarding

14   allegedly unpaid rest time that defeat certification. An employer must authorize and permit its non-

15   exempt employees to take a paid, 10-minute, duty-free rest break for every four hours worked or

16   major fraction thereof. *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1028-1032 (2012).

17   However, employers have no duty to "police" rest breaks and ensure employees perform no work

18   during them. *Id.* at 1040-41; *Gomez v. J. Jacobo Farm Labor Contr., Inc.*, 334 F.R.D. 234, 259 (E.D.

19   Cal. 2019). Employers also have no duty to track or record rest break times. 8 Cal. Code Regs. §

20   11140(7)(A)(3). Where an employer makes a break available, but an employee decides not to take

21   it, the employer owes no premium. *Gomez*, 334 F.R.D. at 260.

22         SK enforced lawful rest break policies that made rest breaks available to its employees. See

23   McGimsey Depo: 128:24-137:7 Evid. Comp. Ex. 4.4. Plaintiffs contend this is irrelevant, claiming

24   SK failed to provide *paid* rest breaks because it paid on a "piece rate" or "commission" only basis

25   that did not compensate for rest periods. Motion, 1:17-19. That is factually inaccurate as the records

26   show SK paid an hourly wage for all clocked hours, including rest breaks. However, even if the Court

27   addresses it, the theory of unpaid time raises important individualized inquiries.

28         For example, if individuals work on a non-hourly (such as a piece-rate basis), they ***"are not***
***entitled to additional compensation for the foregone breaks."*** *Gomez v. J. Jacobo Farm Labor*

*Contr., Inc.*, 334 F.R.D. 234, 259 (E.D. Cal. 2019) (emphasis added); *see Vaquero*, 9 Cal. App. 5th at 111. In other words, an employer owes no pay under the rest time theory where the employee voluntarily skips a rest break. "[T]o determine whether and to what extent Defendant is liable for failing to pay for provided rest breaks, an individualized inquiry will be required to determine, first, which employees in the class took unpaid rest breaks and, second, how many unpaid rest breaks these employees took..." *Gomez*, 334 F.R.D. at 260. For this reason, the Eastern District denied certification of a class of alleged piece-rate employees where it found individualized inquiries would be required to determine "which and how many rest breaks" each employee worked through. *Id.*

The same is true here. While SK enforced lawful rest policies, the testimony reveals a contingent who voluntarily elected to forego their rest breaks. For example, Moniz at times voluntarily decided to work through her rest breaks. Moniz Depo: 118:15-21. Ajemyan admits at times he skipped his rest breaks because he had work and wanted to go home earlier. Ajemyan Depo: 136:2-137:23. Similarly, Gabriel at times skipped meal periods because he did not want to take a break, and would skip rest periods for similar reasons. Gabriel Depo: 121:23-122:16, 126:6-18. Others also voluntarily skipped rest breaks to earn more productivity pay, because they forgot to take them, so they could leave work, or because they did not need one. Summ. No. 32.

Plaintiffs and putative class members also admit they did not record their rest breaks, so would have no way of knowing which days they took them and which days they did not. Ajemyan Depo: 50:10-15, 74:23-76:2, 136:2-137:23; Gutierrez Depo: 123:12-25; Moniz Depo: 118:15-21, 124:10-17, 125:21-126:2, 126:4-23; Gabriel Depo: 30:4-16, 126:6-18, 127:3-13, 130:4-10; Summ No. 33. This necessarily results in individualized inquiries in rest break cases. *Cortez v. Best Buy Stores, LP*, No. 11-cv-5053, 2012 WL 255345, at *4 (C.D. Cal. Jan. 25, 2012); *Cummings v. Starbucks Corp.*, No. 12-cv-06345 MWF FFMx, 2014 WL 1379119, at *19 (C.D. Cal. Mar 22, 2014) (same). The same is true here. Assaf Report ¶51-52.

The issue is more problematic given Plaintiffs are only seeking to certify rest periods in weeks where they earned productivity pay. Motion, 7, fn. 8.They again propose no means of linking the weeks with productivity pay with unpaid rest time. The evidence establishes the putative class is

more likely to skip rest breaks *in busy weeks where they stand to make more in productivity pay*. Summ No. 34. In other words, putative class members chose to skip breaks during the weeks at issue.

Plaintiffs' expert suggests this is not an issue, because he can simply assume one unpaid rest break for each four hours of work or major fraction thereof using the time punches. DuMond Report pg. 9. This misses the mark because as noted above, there is no rest break pay owed if the employee skips his or her rest break. Employees did so in their discretion, and where "persons who are afforded discretion exercise that discretion differently, commonality is not established." *In re Wells Fargo Litig.*, No. 08-MD-01930 MMC, 2011 WL 3903117, at *4 (N.D. Cal. Sept 6, 2011). Plaintiffs present no manageable way of handling the individual inquiries required to certify their "piece rate" or "commission" classes on the issue of rest breaks. Assaf Report ¶51-52. Worse, Plaintiffs' propose paying the rate of pay for rest periods for these "piece rate" workers under Labor Code section 226.2, but since one would need to know the actual amount of rest break time to do so, this raises more individual issues. *Id.*; https://www.dir.ca.gov/pieceratebackpayelection/AB_1513_FAQs.htm. (#1).

## IX.   THE UNPAID OVERTIME CLASSES SHOULD NOT BE CERTIFIED

Plaintiffs, acknowledging their "piece rate" and "commission" classes are not rooted in fact, seek to certify an alternative overtime class that is inconsistent with their core theory of liability. It is based on the argument that from December 2016 to August 2017 (Body Technicians and Painters), and January 2016 to August 2017 (Service Advisors), SK paid rest periods at a higher rate than needed due to confusion over the law. McGimsey Depo: 115:20-116:10. The theory of underpaid overtime (a form of hourly pay) makes no sense, given their core claim SK paid the putative class piece rate or commission only. It also makes no sense legally, as it essentially argues SK underpaid by making a gratuitous overpayment for non-working time akin to a gift. 29 C.F.R. § 778.212. Yet, they claim the overpayment needed to be included in the regular rate of pay. Motion 3:23-27.

The Court should not certify an alternative theory directly contrary to the core claims. It should read the alternative theory for what it is: a concession the core theory lacks factual support.

## X.   THE MEAL PERIOD CLASS CANNOT BE CERTIFIED AS IT LACKS SUPPORT AND THE REGULAR RATE OF PAY CANNOT BE DETERMINED

The "meal period class" rests solely on the argument that, although SK paid meal premium pay, it paid it at the base hourly rate rather than the regular rate of pay. However, under current law,

payments of meal premium pay at the base hourly rate of pay is lawful. The Court of Appeal found so in *Ferra v. Loews Hollywood Hotel*, 40 Cal. App. 4th 1239, 1252 (2019), **review granted**, 456 P.3d 415 (2020). The substantial weight of authority supports the same conclusion. *See, e.g., Valdez v. Fairway Indep. Mortg. Corp.*, No. 18-cv-02748 CAB KSC, 2019 WL 3406912 (S.D. Cal. Jul. 26, 2019); *Frausto v. Bank of Am.*, No. 18-cv-01983 MEJ, 2018 WL 3659251 (N.D. Cal. Aug. 2, 2018); *Brum v. Marketsources, Inc.*, No. 2:17-cv-00241 JAM EFB, 2017 WL 2633414 (E.D. Cal. Jun. 19, 2017); *Bradescu v. Hillstone Restaurant Group, Inc.*, No. SACV 13-1289-GW, 2014 WL 5312546 (C.D. Cal., Sept. 18, 2014). Based on this authority, the meal period argument lacks merit. Since alleged policies do not support certification when they are *facially lawful, Washington*, 271 F.R.D. at 641, the Court should deny certification.[10]

## XI.   THE DIRECT WAGE STATEMENT CLASS SHOULD NOT BE CERTIFIED BECAUSE PLAINTIFFS LACK STANDING TO PURSUE THE CLAIM

Plaintiffs pursue a "direct wage statement" class on the theory that SK failed to include all rates of pay and hours worked for the pay code "Addl OT" on wage statements. (Motion 5:8-14.) Yet, their admissions undermine the basis for this claim and show they lack standing to pursue it.

A plaintiff must have standing to bring a claim to serve as a class representative for it. *Ramirez*, 951 F.3d at 1023. Where simple arithmetic allows the employee to calculate the rate of pay or hours worked from the four corners of the pay stub, there is no wage statement violation. *See, e.g., Morgan v. United Retail Inc.*, 186 Cal. App. 4th 1136 (2010). As the Court of Appeal explained in *Raines v. Coastal Pac. Food Distribs., Inc.*, 23 Cal.App.5th 667, 677 (2018):

> [O]ne can determine the hourly overtime rate 'from the wage statement alone.' (§ 226(e)(2)(B).) It can be 'promptly and easily' determined by simple arithmetic. (*Ibid.*) The mathematical operation required is division, which is taught in grade school. Although many people cannot perform the calculation in their heads, it can be easily performed by use of a pencil and paper or a calculator; no additional documents or information are necessary. (§ 226(e)(2)(C).)

The same is true here. The "Addl OT" payment is the payment made in weeks for which there is both "productivity" pay *and* overtime hours worked, to adjust the regular rate of pay:

---

[10] Plaintiffs also propose no method to calculate the regular rate for meal periods, which under their theory, would have to factor in unknown amounts of "non-productive" time. Assaf Report ¶ 53.

| Earnings | rate | hours | this period |
|---|---|---|---|
| Reg | 16.0000 | 40.00 | 640.00 |
| Ot | 24.0000 | 13.72 | 329.28 |
| Addl Ot | | | 55.74 |
| Productivity | | | 436.53 |
| Californiabreak | | | |
| Prem Overtime | | | |
| Wage Guarante | | | |
| **Gross Pay** | | | **$1,461.55** |

Because SK made these payments in the *same* workweek for which the base overtime is paid, the hours for the "Addl OT" are the same as the overtime hours listed directly above it (13.72). With the hours, one can easily calculate the rate as a matter of simple arithmetic by dividing the total "Addl OT" ($55.74) by the hours (13.72). All information needed to calculate the "Addl OT" rate is readily available from the face of the paystub. See McGimsey Depo: 101:19-103:22; Assaf Report ¶¶55-56.

***More important, Plaintiffs agree they can do the simple math necessary to determine the rate given the total amount of pay and the hours***. Gabriel Depo: 131:10-132:17; Gutierrez Depo: 160:2-24; Moniz Depo: 128:2-129:2. Because there is no wage statement claim based on their admissions, they lack standing to pursue the claim.[11] It is permissible to peak to the merits to make this straightforward determination. *Dukes*, 564 at 351; *Magadia,* 324 F.R.D. at 225.

## XII.   THE DERIVATIVE CLAIMS SHOULD NOT BE CERTIFIED BECAUSE THE UNDERLYING THEORIES FAIL AND SHOULD NOT BE CERTIFIED

Plaintiffs also seek to certify subclasses based on derivative violations. Motion 21:7-10. They include the Derivative Wage Statement Class; Waiting Time Penalty Class I (Body Technicians / Painters); and Waiting Time Penalty Class II (Service Advisors). Notice of Motion at 2-3. For numerous reasons, the Court should not do so.

__First__, Plaintiffs cannot certify derivative claims where the underlying claims giving rise to them fail. *Clemens ex rel. Aggrieved Emps. Pursuant to the Private Attorneys Gen. Act v. Hair Club for Men, LLC*, No 15-cv-01431 WHA, 2016 WL 1461944, at *8 (N.D. Cal., Apr. 14, 2016). Since the derivative classes are "wholly" derivative of the underlying claims, they fail too.

---

[11] Plaintiffs misleadingly cite to *Magadia v. Wal-Mart, Inc.*, 384 F. Supp. 3d 1058 (N.D. Cal. 2019) to create a wage statement issue. However, in *Magadia*, the absent rate/hours concerned a *quarterly bonus*, not incentive pay in the same pay period. *Id.* at 1092. A Walmart employee would need to review every paystub in the quarter to determine the hours worked, only thereafter could they calculate a rate. Here, SK listed the hour on the line ***directly above*** "Addl OT" pay.

1    **Second**, the proposed Waiting Time Classes (I and II) are overbroad. Plaintiffs base their

2    waiting time classes on the meal period class. Motion at 21:14-15. However, waiting time pay cannot

3    rest on a failure to provide proper meal premium pay. *Naranjo v. Spectrum Sec. Servs.*, 40

4    Cal.App.5th 444, 474 (2019), *review granted*, 455 P.3d 704 (2020); *Ling v. PF Chang's China*

5    *Bistro, Inc.*, 245 Cal. App. 4th 1242, 1261 (2016); *Singletary v. Teavana Corp.*, No. 5:13-cv-01163

6    PSG 2014 WL 1760884 at * 3-4 (N.D. Cal. May 2, 2014); *Jones v. Spherion Staffing LLC*, No. LA

7    CV-11-06462 JAK, 2012 WL 3264081 (C.D. Cal. Aug. 7, 2012).

8    **Third**, the Derivative Wage Statement Class appears overbroad. Counsel cannot seem to

9    decide if this class rests on meal premium pay or not. *Compare* Notice of Motion at 2:20-24 (not

10   including meal period claims as a basis for derivative wage statement claims) *with* Motion at 21:7-8

11   (basing claim in part on the meal period class). If it does, courts hold that a theory of wage statement

12   liability cannot rest on meal premium pay. *Naranjo,* 40 Cal.App.5th at 474; *Jones*, 2012 WL 3264081.

13   **Fourth**, the Derivative Wage Statement Class rests on the premise that if the Court finds that

14   SK paid on an unlawful piece-rate or commission system, the wage statements fail to display the

15   applicable hours or payments. This theory is not viable. It goes against the "commonsense position

16   that the pay stubs were accurate in that they correctly reflected the hours worked and the pay

17   received" at the time of payment. *Maldonado v. Epsilon Plastics, Inc.*, 22 Cal.App.5th 1308, 1336-

18   1337 (2018). Where it is "subsequently determined that the employee had actually *earned* the right

19   to additional compensation," the Court of Appeal has held there is no derivative wage statement

20   penalty. That is exactly what happened in *Maldonado*.

21   **XIII.    CONCLUSION**

22       For the foregoing reasons, the Court should not certify any of the proposed classes.

23   DATED: February 19, 2021                    OGLETREE, DEAKINS, NASH, SMOAK &
                                                  STEWART, P.C.
24

25                                               By:  *s/ Tim L. Johnson*
                                                      Spencer C. Skeen
26                                                    Tim L. Johnson
                                                      Jesse C. Ferrantella
27                                                    Cameron O. Flynn
                                                 Attorneys for Defendant
28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on February 19, 2021, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to the email

4

addresses denoted on the Notice of Electronic Filing.

5

I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct.  Executed on February 19, 2021.

7

8

By: */s/ Tim L. Johnson* _____
       Tim L. Johnson

9

10

46094244.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION